IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BRIAN ELDER,

                    Plaintiff,                    OPINION AND ORDER

v.

                                            21-cv-671-wmc

QUARTZ HEALTH SOLUTIONS,
INC.

                    Defendants.

---

      Plaintiff Brian Elder sued Quart Health Solutions, Inc. for denying him continuing inpatient health care benefits in violation of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq.  Now before the court are the parties' cross motions for summary judgment.  (Dkt. #20; dkt. #23.)  For the reasons below, the court will grant summary judgment to Quartz.

UNDISPUTED FACTS[1]

**A.  Hospital Stay**

      On August 12, 2019, Brian Elder suffered a heart attack and was admitted to the hospital, where he underwent surgery.  While hospitalized, Elder developed an infection and was treated with IV antibiotics, as well as a "wound vac."[2]  On September 9, 2019, Elder was discharged to Hillview Healthcare Center ("Hillview"), which is a skilled nursing facility.

---

[1] Unless otherwise noted, the court finds the following facts material and undisputed.

[2] Generally, a wound vac is a therapeutic technique using a suction pump, tubing and dressing to drain and promote healing.  https://en.wikipedia.org/wiki/Negative-pressure_wound_therapy (last checked 10/4/2022).

However, Elder was readmitted to the hospital three days later due to pain and fluid accumulation in his abdomen. By September 24, 2019, Elder's doctor again decided he was stable for discharge subject to his once more being discharged to a skilled nursing facility or 24/7 care at home because of a continued infection risk and need for a wound vac.

Social worker Danielle Hancock met with Elder that day to discuss discharge planning. At that meeting, Elder was apparently upset about the discharge order, but after Hancock explained that refusing to discharge would put him at financial risk, Elder agreed to discharge to a skilled nursing facility in La Crosse, Onalaska, or West Salem, Wisconsin, subject to one condition: that he not be returned to Hillview. The record is unclear as to *why* Elder refused to be returned to Hillview; indeed, he later conceded having no reason to dislike Hillview.

Unfortunately, none of the other facilities in La Crosse, Onalaska, or West Salem were able to take Elder, while Hillview would have taken Elder on September 25, 2019, had Elder not refused to go to there.[3] Rather than being discharged on September 25, however, Elder was examined by Neuropsychologist Teresa Susmaras, PhD, who concluded that he had diminished capacity. Nevertheless by the next day, when Dr. Susmaras did a follow-up examination, she concluded that Elder's cognitive function had drastically improved since the day before, although he remained at risk of a cognitive decline due to a "mild neurocognitive disorder." Thus, on September 26, Elder agreed to discharge from

---

[3] While Hillview was unable to take Elder until September 25, Elder's coverage was apparently approved through the night of the 24th, making this a non-issue for coverage. (Def.'s Opp'n (dkt. #27) 3.)

2

the hospital to any facility, *including* Hillview, but was informed that Hillview similarly no longer had a bed available for him. As a result, Elder stayed in the hospital until October 3, 2019, when the Caledonia Rehab and Retirement facility just across the border in Minnesota had nursing care and a wound vac available for use.

### B. Coverage Dispute

Regarding the ongoing coverage dispute between the parties, Elder's health providers requested a continuation of inpatient stay from Quartz on September 24, when the hospital was unable to find a skilled nursing facility bed, other than Hillview. However, that same day, Quartz denied the request, noting that Elder was suitable for discharge *and* a bed at Hillview was available starting on September 25.

On November 1, 2019, Elder appealed this denial of coverage, arguing that the inpatient care was necessary. Quartz upheld the denial upon second level review and a meeting of the Reconsideration Committee. At each stage, Quartz noted that Elder refused to discharge on the 24th, when Hillview was available to admit him.

Finally, Elder received a third-party review under the Affordable Care Act from MAXIMUS Federal Services, Inc. MAXIMUS upheld the denial of coverage, finding that the requirement of medical necessity was not met.

## OPINION

Summary judgment must be granted against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S.

317, 323 (1986). If there is any genuine issue as to any material fact, the court cannot grant summary judgment. *Id*. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). Finally, "[t]he evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Id*. at 255.

The parties agree that "[t]he standard of review for a claim under 29 U.S.C. § 1132(a)(1)(B) is de novo 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" (Pl.'s Op. Br. (dkt. #) 2-3) (*quoting Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).) When the administrator does have discretionary authority, "a denial of benefits will be reviewed under an arbitrary and capricious standard." *Militello v. Cent. States, Se. & Sw. Areas Pension Fund*, 360 F.3d 681, 685 (7th Cir. 2004). It is undisputed that Quartz has discretionary authority under the Plan as it relates to medical necessity. (Pl.'s Resp. to Def.'s PFOF (dkt. #28) ¶ 23.)

This 'arbitrary and capricious' standard is extremely permissive, and the court should only overturn Quartz's determination in extraordinary circumstances. "Under the arbitrary and capricious standard, a plan administrator's decision should not be overturned as long as (1) 'it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome,' (2) the decision 'is based on a reasonable explanation of relevant plan documents,' or (3) the administrator 'has based its decision on a consideration of the relevant factors that encompass the important aspects of the problem.'" *Hess v. Hartford*

*Life & Acc. Ins. Co.*, 274 F.3d 456, 461 (7th Cir. 2001) (quoting *Exbom v. Central States, Southeast and Southwest Areas Health and Welfare Fund*, 900 F.2d 1138, 1142–43 (7th Cir.1990).)

Still, if the administrator "has both the discretionary authority to determine eligibility for benefits and the obligation to pay benefits when due," as appears to be the case here, the court may take into account that conflict of interest. *Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir. 2009). While the standard of review is still arbitrary and capricious, "[a]n administrator's conflict of interest is a key consideration under this deferential standard." *Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010). Regarding evidence, "in evaluating a plan administrator's decision under an arbitrary and capricious standard of review, we should consider only the evidence that was before the administrator when it made its decision." *Hess*, 274 F.3d at 462.

Given this deferential standard, the question before the court is whether Quartz acted arbitrarily and capriciously in deciding that Elder's hospitalization from September 24-October 3 was not medically necessary, considering the evidence available to Quartz at the time. Given the administrative record, the court finds that it was not arbitrary and capricious for Quartz to determine that Elder's hospital stay after September 24 was not medically necessary.

The plan defines medical necessity as "a service, treatment, procedure, Prescription Drug, device or supply . . . that is required to identify or treat a Member's Illness or Injury" and meets the following criteria:

5

> (1) Consistent with the symptoms or diagnosis and treatment of a Member's Illness or Injury;
> (2) Appropriate under the standards of acceptable medical practice to treat that Illness of Injury;
> (3) Not solely for the convenience of the Member, Physician, Hospital or other health care Provider,
> (4) The most appropriate supply or level of service that can be safely provided to the Member and which accomplishes the desired end result in the most economical manner; and
> (5) Not primarily for cosmetic improvement of the Member's appearance, regardless of psychological benefit.

(AR 17.) Additionally, "Hospital stays extended for reasons other than Medical Necessity are not covered and become the Member's responsibility for payment. For example, inclement weather, lack of transportations, lack of a caregiver at home and other social reasons do not justify coverage for an extended Hospital stay." (AR 47.)

Elder does not argue that he was not stable enough for discharge on September 24th. Instead, he argues that his refusal to return to Hillview on the 24th was due to impaired cognition. By the 26th, Elder apparently regained competency, at which point *no* La Crosse area facility could accept a patient with a wound vac, including Hillview. Because Elder needed 24/7 care upon discharge, the hospital stay itself was medically necessary until he was able to be placed in a skilled nursing facility with a wound vac.

On this record, Elder's hospitalization breaks down into four, distinct periods of time. First, before September 24th, Elder was not considered suitable for discharge by his providers. Second, between September 24-25, Elder was stable enough for discharge and could have been discharged to Hillview, which was able to provide wound care beginning on the 25th, although he refused to be placed there at that time. Third, between September 26 and October 3, Elder was suitable for discharge and willing to go to Hillview or another

6

facility, although no La Crosse area facility had an available bed for Elder by the 26th, including Hillview. Fourth, on October 3, Elder was discharged to a nursing facility with an available wound vac just across the Minnesota border from La Crosse. Only then did Elder leave the hospital.

In order to excuse his refusal to discharge on the 24th (really the 25th when a Hillview bed would become open), Elder principally argues that he was cognitively impaired and unable to "refuse" a discharge. None of the documents in the administrative record indicate that Elder was cognitively impaired on the 24th; instead, Elder's evidence of impairment was from the 25th, after Elder had *already* refused placement at Hillview. Indeed, Quartz notified Elder on the 24th that "[t]he request for the continuation inpatient stay at Gundersen Lutheran Medical Center LA Crosse is considered not medically necessary beginning September 24, 2019." While one might assume that Elder was also impaired on the 24th, there was functionally no evidence for or against that proposition.

At most, the record shows that Elder was informed of the consequences of refusing discharge on the 24th, including an in-depth discussion of what insurance would and would not cover. Further, the social worker even wrote on the 24th that Elder remembered "that his deductible starts over in October and notes that private pay at home for help vs [a skilled nursing facility] would be the same." (AR 76.) These notes provide evidence, although scant, that Elder had some understanding of his insurance coverage on the 24th, or at the very least that he was sufficiently warned of the financial repercussions of refusing

7

discharge. Since there is no evidence that Quartz knew more than this at the time of the coverage decision, its denial cannot reasonably be found arbitrary and capricious.

Moreover, even assuming a reasonable jury could find it more likely than not that Elder was *not* competent on the 24th, it was still not arbitrary and capricious for Quartz to refuse coverage. As Quartz repeatedly argues in its briefing, nothing in the subject plan requires that it ensure competency on behalf of the member when they make coverage decisions. Nor is there anything in the plan that suggests coverage is contingent on cognitive functioning. As Quartz notes in particular, "[i]nsureds make decisions every day about their health and treatment options that may not be in their best interests or made with a complete understanding of their impact." (Def.'s Opp'n (dkt. #27) 4-5.) Although neither party cites case law directly on point, common sense suggests that insurers can and must make coverage decisions for incapacitated persons in both emergency situations or severe illness.

Certainly, while the court is sympathetic to the argument that Elder should not be financially penalized if he refused a reasonable coverage option due to incompetence or even by mistake. However, "[t]he arbitrary and capricious standard holds that a trustee's decision shall not be overturned on a § 1132(a)(1)(B) matter, absent special circumstances such as fraud or bad faith, if 'it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome.'" *Exbom v. Cent. States, Se. & Sw. Areas Health & Welfare Fund*, 900 F.2d 1138, 1142 (7th Cir. 1990) (*quoting Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir.1985).) Here, there is no fraud or bad faith to be found, and even taking into account Quartz's conflict of interest in denying coverage, Quartz offered and the

evidence supports a "reasoned explanation" for that decision. "We emphasize that the question isn't whether we would have" denied coverage, "but whether [Quartz's] decision to do so finds 'rational support in the record.'"
*Jenkins v. Price Waterhouse Long Term Disability Plan*, 564 F.3d 856, 861 (7th Cir. 2009).

To the extent that Elder was unable to discharge between September 26 and October 3 because there was no available nursing facility, it was also reasonable for Quartz to view that problem as self-inflicted. Having been told of his options and warned of the financial consequences of refusing discharge to Hillview, Elder did so anyway. Had Elder followed medical advice, as well as his own self-interest under his insurance plan, he would have been in a skilled nursing facility as soon as he was able to discharge on the 25th. The fact that a skilled nursing facility wasn't available by the 26th when he agreed to accept a discharge to Hillview does not change the fact that he effectively forfeited coverage on the 24th. Given Quartz's reasoned explanation of its denial is supported by the evidence *and* the lenient standard of review this court is obligated to apply, no reasonable jury could find that Quartz's denial was arbitrary or capricious.

Elder also claims Hillview actually *had* a bed available, at least between September 26 and October 3. Although Hancock told Elder that Hillview no longer had a room on the 26th, Elder's associate went to Hillview on October 1, 2022, to pick up his personal effects, finding them all still in his room and his clothes hanging in the room's closet. (AR 103.) Moreover, when Elder's associate asked a certified nursing assistant if the facility was full, and she replied that it was not, and that the facility assumed Elder would be

returning. (*Id.*) In his appeal to MAXIMUS, Elder suggests that Hancock lied to him to keep him in the hospital and "get full pay" from him. (*Id.*)

The issue of whether Hillview had a room available at that time is somewhat beside the point, since whether or not the *hospital* took too long to find a room has little to do with whether Quartz is required to cover the stay. While the court understands Elder's apparent frustration at hearing second-hand that he may have been able to go back to Hillview sometime after the 26th, there is no substantive evidence to that point, much less that Quartz was somehow responsible for that oversight when Elder was effectively denied coverage based on his own decision on the 24th. Indeed, the *only* evidence before the administrator to that point was Elder's letter recounting what his friend heard from an anonymous nursing assistant at Hillview. (AR 103.) It was not arbitrary and capricious for the administrator to decide such evidence was not credible. Again, "[t]he arbitrary and capricious standard is the least demanding form of judicial review of administrative action, and any questions of judgment are left to the administrator of the plan." *Trombetta v. Cragin Fed. Bank for Sav. Emp. Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir. 1996).[4]

Finally, plaintiff alternatively requests that Quartz pay for a portion of Elder's hospital stay equivalent to what the insurer would have paid for a skilled nursing facility

---

[4] Admittedly, a question remains as to whether Elder could have actually been transferred to Hillview on September 25th given a finding of incompetence on that date. However, there is no evidence that Quartz was ever made aware of that finding before denying coverage or on appeal from that denial. Indeed, it appears the first time this finding was brought to anyone's attention with respect to the coverage issue was during the third-party review under the Affordable Care Act to MAXIMUS. (AR 103.) Even if not correct, it was up to Elder to present that evidence at summary judgment.

during that same period.[5]  While this may have been a reasonable compromise, it is not one supported by the law or by text of the plan.  Specifically, there is no indication that such coverage is required, nor that the court could order it once Elder declined a reasonable offer of paid service.  Likely, this is why Elder devoted a single paragraph to this argument in briefing to this court, and never even asked for such a partial payment in administrative review, putting it beyond the realm of this court's review.  As such, the court is unable to order this relief.

## ORDER

IT IS ORDERED that:

1) Defendant Quartz Health Solutions, Inc.'s motion for summary judgment (dkt. #20) is GRANTED.

2) Plaintiff Elder's motion for summary judgment (dkt. #23) is DENIED.

3) The clerk of court is directed to enter judgment in favor of defendant and close the case.

Entered this 6th day of October, 2022.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge

---

[5] Elder has also requested attorney's fees, but given that Elder has not shown "some degree of success on the merits," an award of fees is inappropriate. *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 694 (1983)